27747. BOATENREITER *v.* FULTON NATIONAL BANK.

DECIDED OCTOBER 11, 1939. ADHERED TO ON REHEARING DECEMBER 20, 1939.

*Walter A. Sims, Henry M. Henderson,* for plaintiff.
*Hirsch & Smith, E. D. Smith, A. S. Clay,* for defendant.

FELTON, J. B. W. Boatenreiter, trading as Mutual Supply Company, sued Fulton National Bank of Atlanta in trover for six checks signed by E. M. Williams, payable to Mutual Supply

Company and C. B. Driskell, drawn on the National Bank of Monroe, alleging that C. B. Driskell wrongfully and without authority indorsed petitioner's name thereon and that the defendant indorsed the checks guaranteeing the previous indorsements, on the strength of which the drawee bank paid the checks etc. Electing to take a money verdict the plaintiff prayed for a judgment for $735 and interest from date of demand. The bank defended on the ground that the payees on the checks had formed a partnership and the drawer of the checks had authorized the defendant to pay the checks to Driskell upon his indorsement, the drawer having stated to the defendant bank that the payees were partners. The plaintiff denied that a partnership existed. In view of the evidence it will be unnecessary to consider this phase of the case.

E. M. Williams secured a contract with the Federal government for the construction of a post office in Decatur, Georgia. Driskell obtained the sub-contract for installing the plumbing and heating fixtures for $3700. Driskell induced Mutual Supply Company to co-operate in the furnishing of the necessary fixtures. Driskell was a laborer, a plumber, and Mutual Supply Company sold fixtures. Williams agreed to raise the heating and plumbing contract to $4000. We shall assume, for the sake of argument, as the plaintiff contends, that there was no partnership. Plaintiff's evidence is to the effect that there was no agreement between Driskell and him as to a division of the money, no definite understanding as to what the plaintiff was to get for the fixtures and Driskell for his labor. Driskell swore that the agreement was that the fixtures were to cost $3215.15. The evidence was that plaintiff advanced certain sums to Driskell in addition to the money derived from the checks, but the amount was not shown. The plaintiff received $2319.69. It put into the job in fixtures $3916.41. The evidence does not show how much Williams has paid on the contract.

Assuming that there was no partnership, the money received should have been divided between the parties on an equitable basis, according to the reasonable value of the labor and material furnished. If the bank is liable on the checks sued on, it would be liable only for the proportion to which the plaintiff was entitled. The evidence failed completely to provide any kind of facts or information from which it could be determined what that liability

is. The same is true if the plaintiff agreed to furnish the fixtures at the amount stated by Mr. Driskell. The evidence did not demand a finding that Boatenreiter was the sole owner of the legal title to the checks, or that he was entitled to the sole and exclusive possession and right of control of the same, or that he was entitled to the entire. proceeds of the checks. In these circumstances the judge of the civil court of Fulton County, trying the case without a jury, did not err in finding for the defendant.

*Judgment affirmed. Sutton, J., concurs. Stephens, P. J., dissents.*

STEPHENS, P. J., dissenting. B. W. Boatenreiter, trading under the name of Mutual Supply Company, instituted a trover action against Fulton National Bank of Atlanta, seeking to recover a money judgment against the defendant for the principal amount of six checks which were signed by E. M. Williams, and made payable to Mutual Supply Company and C. B. Driskell. It appeared from the petition that these checks were drawn by Williams on the National Bank of Monroe, that they were delivered to Driskell, that the name of Mutual Supply Company was indorsed thereon by Driskell, without any right or authority, and that the indorsements of the petitioner's name upon these checks were forgeries. It was further alleged that neither the plaintiff nor any of his agents or representatives indorsed any of the checks, and that Driskell indorsed his own name thereon and wrongfully and without authority indorsed the plaintiff's trade-name. It appeared that these checks were presented by Driskell to the defendant bank and that that bank cashed them, and the plaintiff has never received any of the proceeds therefrom. It appeared that the defendant bank thereupon indorsed the checks and guaranteed all prior indorsements thereon to be genuine; that by reason of this guarantee and indorsement by Fulton National Bank the National Bank of Monroe paid the amount thereof to the defendant bank; that the plaintiff, after he had discovered the forgeries, demanded of the defendant bank payment of the proceeds of the checks, which demand was refused; that all of the checks and all of the proceeds thereof are the property of the plaintiff, and the plaintiff is entitled to the entire amount thereof. The plaintiff elected to take a money verdict for the amount of the proceeds of the checks, together with reasonable damages and hire and with interest from the date of the demand.

The defendant denied liability but admitted that it cashed these checks and indorsed them over to the drawee bank guaranteeing all prior indorsements. The defendant further alleged that the relation of partnership existed between Driskell and Mutual Supply Company with regard to the transactions referred to in the petition, and that by virtue of this partnership Driskell was authorized to indorse the checks and to receive the proceeds thereof, and that therefore the defendant was not liable as alleged by the plaintiff. The case came on for trial before the judge of the civil court of Fulton County, without the intervention of a jury, who found for the defendant. The plaintiff excepted.

It appears from the evidence that the drawer of the checks, Williams, had a contract to build the post office at Decatur for the government, and that he sub-contracted with Driskell to install the heating and plumbing fixtures therein, and that Driskell, who was a plumbing contractor, procured the plaintiff, a materialman, trading as Mutual Supply Company, to furnish the plumbing and heating material, agreeing to pay the plaintiff therefor out of the monies derived by virtue of his contract with Williams to install the plumbing and heating fixtures in the building. There was no evidence of any agreement to share the profits in this undertaking, nor was there evidence as to any joint ownership of partnership property, nor was there evidence as to any joint liability for any partnership debts or agreement to share losses in the undertaking. It is true that the employee of the defendant bank would not cash these checks for Driskell until Williams stated that Driskell and the plaintiff were partners in this venture and that Driskell had a right to the proceeds of the checks and could properly indorse the plaintiff's name thereon, and that he (Williams) would be responsible to the bank therefor. There was also evidence that Williams informed Driskell that he (Driskell) and the plaintiff were partners in the furnishing and installation of these fixtures and in the contract with him (Williams) to install them, and that he (Driskell) had a right to indorse the plaintiff's name to the checks, cash them, and use the proceeds to pay for labor on the job. Williams's statement did not constitute the parties partners.

The letter of March 16, 1936, to Williams from Driskell, containing the signature of Mutual Supply Company by N. L. Beall and accepted by Williams, to the effect that Driskell had entered

into a contract with Williams to furnish all the work, material, and equipment for the heating and plumbing of the post office in Decatur for $3700 and asking Williams to agree to increase this contract price to $4000, that Mutual Supply Company had already ordered some fixtures for Driskell to use in this work, and that Driskell was asking Mutual Supply Company to join him in the request and agree to furnish the material for the completion of the job, does not show a partnership arrangement between Driskell and Mutual Supply Company as to the furnishing and installation of heating and plumbing fixtures in the post office at Decatur. The evidence does not authorize a finding that Driskell and Mutual Supply Company were partners. It is contended by the defendant bank that, assuming it to be true that Driskell and the plaintiff were not partners, and that Driskell had no authority to indorse the plaintiff's name to these checks, the plaintiff was not entitled to recover of the defendant because the evidence does not show what the interest of the plaintiff in these checks, if any, amounted to, and that therefore it does not appear that the plaintiff was damaged by any conversion by the bank of these checks.

It appears from the evidence that E. M. Williams had a contract with the Federal government to erect a building for a post office at Decatur; that Driskell was a plumbing contractor and a plumber; that Williams and Driskell entered into a sub-contract whereby Driskell was to install the plumbing and heating fixtures in this building; that Driskell approached the plaintiff and inquired if the plaintiff wished to furnish the plumbing and heating materials and supplies to go into this building; that the plaintiff had had previous dealings with Driskell, furnishing to him materials for other contract jobs; that Driskell did not pay therefor and bankrupted against the plaintiff; that the plaintiff, before he would agree to furnish the materials and supplies to Driskell on the contract with Williams to install the plumbing and heating fixtures in this post office building, sent his agent with Driskell to see Williams, and in Williams's office, with Driskell present, it was agreed that the monies paid by Williams to Driskell on the contract, as the work progressed, would be paid by check payable to Driskell and the plaintiff jointly and that the checks would be delivered to the plaintiff.

The plaintiff testified as follows: "Owing to Mr. Driskell bank-

rupting against me I didn't want to sell him material unless I had some guarantee of collecting my money, and Mr. Williams agreed to see that we got our money when we delivered our materials. . . Williams was to see that Mutual Supply Company was to receive their money, but I never did know the contents of what they signed. As to whether I ever did know what the agreement was as between Mutual Supply Company and Mr. Driskell—well, if he had it with Mr. Beall I don't know it."

Mr. Beall, the agent of the plaintiff, testified as follows: "Mr. Boatenreiter told him [Driskell] in the next day or two that the material ran very close to the contract; that he wouldn't be willing to handle it without some guarantee. I took Mr. Driskell in my car and we went to Monroe and interviewed Mr. Williams, who agreed in his office to make the checks payable to us jointly and mail me the checks. That was the only condition under which we would handle the job. As to whether that was done—one check, I believe, was mailed to me, one or two others were brought to me by Mr. Driskell, and we never received any more. They were made payable to C. B. Driskell and Mutual Supply Company jointly. . . It was merely a verbal agreement in Mr. Williams's office that he would send me—he would make the checks jointly and send them to me. I went to Monroe at the suggestion of Mr. Boatenreiter, or at least we held a consultation about it and he said he wouldn't want to handle it except under those conditions. . . As to what we agreed to furnish the heating for, while you are looking at that, I am going to be perfectly frank with you, we never did give him [Driskell] the exact price of what we were going to furnish the material for. Our agreement was to furnish the material on the job, and we were to get the checks in our office first for the payment of the material. There was never a definite amount set for Mr. Driskell, for plumbing and heating. As to whether there was an arrangement that we were to take from the checks we received any amount we wanted to and give him any amount we thought he was entitled to get, we could have done that. . . As to what I would say he [Driskell] had coming out of these six checks, I wouldn't say he had anything at that time; in other words, all this would have gone to us for these supplies. That had been the practice before on previous checks made payable to Driskell and Mutual Supply Company; I had given him some

money back on some checks. He would bring the check in and indorse it over to Mutual Supply Company and then I would handle the check and then pay him. . . . Our agreement was to furnish the material on the job, and we were to get the checks in our office first for the payment of the material. There was never a definite amount set for Mr. Driskell for plumbing and heating. As to whether there was an arrangement that we were to take from the checks we received any amount we wanted to and give him any amount we thought he was entitled to get, we could have done that. As to whether that was the agreement, that wasn't the agreement. I wouldn't take advantage of the boy by taking every cent he had on the job probably, but I could have done it according to my and Mr. Driskell's agreement. As to what that agreement was, we had no agreement. As to whether my interpretation of it is that since we had no agreement we could take anything that we wanted to out of the check, no, that is not my interpretation of it; but we could have taken what was actually billed to the job. The actual amount that was billed to the job was $3916.41."

It appeared that one or two checks were delivered to the plaintiff, but that others were sent to Driskell who brought them to the plaintiff; that six of these checks totalling $735 (the ones here involved) were not sent directly to the plaintiff, and were not brought to the plaintiff by Driskell, but were received by Driskell and cashed by him at the defendant bank by Driskell's indorsing the name of the plaintiff thereon without any permission or authority from the plaintiff; that these checks were drawn on the National Bank of Monroe and signed by Williams, and that when these six checks were cashed by Driskell there was due the plaintiff for materials a sum in excess of the amount of the checks. The evidence showed that while the plaintiff did give to Driskell a part of the proceeds of the checks which were delivered to the plaintiff there was no agreement for the plaintiff to pay Driskell any amount thereof; that the plaintiff had the right to apply the same towards the cost of the materials and supplies which he had furnished on this contract, but that the plaintiff advanced a portion of these checks to Driskell to cover the cost of his labor and time on the job and to pay his helpers, which sums were charged to Driskell.

Driskell was present when this agreement as to the checks was made. He does not deny it. He testified as follows: "I knew

that it was to be payable to Mutual Supply Company and myself, but I hadn't thought of it on a partnership basis; in fact, I wasn't looking forward to anything like this. As to why the checks were drawn jointly to Mutual Supply Company and myself, I don't know. When Mr. Beall and I were in Monroe we were discussing the matter and I think that I was the one that suggested that he just make all the checks payable to both of us. · . . I never did say, before I started making these indorsements, that I would take the check to them and draw from them a sufficient amount of money to pay the labor on the job, but I did do that. . . As to whether when Mr. Boatenreiter said we are going to get our money he meant by that he wanted to get the money for his supplies, well, I do know since you brought that up that he and Mr. Beall testified on the previous case that they were supposed to get all the money that was coming on the job. As to whether it was just for material, or all on the job, well, that is their testimony. Go back and look on the record and see. As to whether he meant by that that I owed them for the material that was delivered to the place, that they sent me, well, it was only for $4000 in the contract and he stated a while ago there was thirty-nine hundred and something charged to the job, and I showed you a quotation a while ago of thirty-two hundred and something."

Driskell was not entitled, as a matter of law or of contract, to any of the proceeds of the six checks wrongfully cashed by him. The evidence showed, taking the testimony of Driskell on behalf of the defendant, that the cost of the materials amounted to $3215.15, and the evidence was that the plaintiff had only been paid $2339.11 of this sum. The plaintiff lacked more than the amount of the checks of being paid for the material. As aptly stated by counsel for the plaintiff in his brief on rehearing, the evidence showed "that the plaintiff was due, each time one of the checks was issued, an amount greater than the sum stated on the check, and that none of the amounts then due at the respective times have ever been paid; . . that the contract price between E. M. Williams and C. B. Driskell for the installation of the plumbing and heating was $4000 at the times the checks in question were drawn, and that the lowest figure fixed by the evidence for the contract price for the materials furnished by the plaintiff was $3200; that plaintiff was only the materialman and was not involved with Driskell

in a joint enterprise for the installation of the equipment; that the parties agreed for the checks to be made payable to both plaintiff and Driskell as a means of securing plaintiff for the payment for the supplies furnished by him; that plaintiff would have obtained his funds if the defendant bank in this case had not intermeddled and deprived plaintiff or his agents of the opportunity of indorsing and cashing the checks."

"Where an instrument is payable to the order of two or more payees or indorsees who are not partners, all must indorse, unless the one indorsing has authority to indorse for the others." Code, § 14-412. "When a signature is forged or made without the authority of the person whose signature it purports to be, it is wholly inoperative, and no right to retain the instrument, . . can be acquired through or under such signature." Code, § 14-223. Where a check is payable to two or more persons jointly all must join in the transfer in order to pass the title. One of several payees ordinarily has no authority to indorse the name of his co-payee unless authorized to act for him, and such authority is expressly shown. 10 C. J. 680, § 194; 4 N. I. L. § 41; *Heard* v. *Kennedy*, 118 *Ga.* 36 (42 S. E. 509).

A bank which has obtained possession of a check on an unauthorized or forged indorsement of the payee's signature, and collects the amount of the check from the drawee bank, is liable for the proceeds thereof to the payee, notwithstanding they have been paid to the person from whom the check was obtained. See authorities cited in 31 A. L. R. 1068 et seq. and 67 A. L. R. 1536. See also *Citizens & Southern Nat. Bank* v. *Davis*, 54 *Ga. App.* 836 (188 S. E. 589). The act of the bank in cashing the checks on the forged or unauthorized indorsements of one of the joint payees amounted to a conversion of the checks. 31 A. L. R. 1071, and cases cited in 67 A. L. R. 1538.

It appears conclusively without dispute from the evidence that Driskell had no authority to transfer the checks to the defendant bank, and that the defendant bank obtained no title to the checks by virtue of the indorsement thereof by Driskell. According to the conditions under which the plaintiff entered into the contract to furnish materials to Driskell, the checks were to be payable to both the plaintiff and Driskell, and by Driskell were to be turned over to the plaintiff as security or payment for the materials fur-

nished by the plaintiff to Driskell to be used on the job. While the plaintiff testified that his employee, Beall, had no authority to enter into the contract with Driskell, it does appear from his testimony that the only conditions under which he would enter into the contract were that the checks were to be payable as above indicated as security for the materials furnished, and that he authorized Beall, his agent, to go to Monroe with Driskell to confer with Williams, and there was made this arrangement for the handling of the checks. This arrangement was carried out and checks were made accordingly and transferred by Driskell and delivered to the plaintiff. It therefore appears without dispute from the evidence that this was the agreed arrangement as to the handling of the checks. The plaintiff was therefore entitled to the checks sued on and to have Driskell indorse them over to the plaintiff, after they had been delivered to Driskell by Williams.

After the checks had been delivered to Driskell the plaintiff was entitled to the legal title thereof. When Driskell placed his indorsement upon the checks the plaintiff became entitled to the possession of the checks, and, Driskell not being entitled to the possession of the checks, the plaintiff thereby acquired the legal title, notwithstanding the fact that Driskell had not physically delivered the checks to the plaintiff. It is undisputed from the evidence and the law applicable thereto that the defendant bank did not acquire any title to the checks by the sole indorsement of Driskell, who was only one of the payees of the checks. Therefore, the bank, in cashing the checks for Driskell and acquiring possession thereof, and in refusing to account to the plaintiff for the proceeds of the checks upon demand by the plaintiff, committed a conversion of the checks. The plaintiff, having the right of possession of the checks as against the whole world, which the plaintiff had, irrespective of whether he had the legal title thereto, he had the right to maintain trover against the bank for the conversion of the checks. It appears conclusively from the evidence that the plaintiff was entitled to the entire proceeds of these checks to be applied in payment on the materials which the plaintiff had furnished to Driskell to be applied under Driskell's contract to the job.

It is, however, immaterial what was the amount of the plaintiff's interest in the proceeds of the checks. It is immaterial, as respects the plaintiff's right to recover against the bank, what was

due the plaintiff by Driskell or what was due Driskell by the plaintiff. When the plaintiff showed title to the checks, or right of possession, or title or right of possession to the proceeds of the checks, all of which the plaintiff showed by the undisputed evidence, the plaintiff showed a prima facie right to recover of the bank the full amount represented by the checks which the bank had converted. What the plaintiff may be entitled to out of the proceeds of the checks as against Driskell was no concern of the bank. If the bank showed, which it has not done, what was the plaintiff's share of the proceeds of these checks, as against Driskell, the bank could reduce the amount of damages arising out of its conversion of the checks.

The proposition that a plaintiff in trover, who proves a conversion by the defendant of property to which the plaintiff had at least the right of possession as against the defendant, can not recover without showing his right in the property as against a third person and a stranger to the transaction seems to me untenable. See 65 C. J. 66, 67. The evidence demanded a verdict for the plaintiff in an amount representing the full value of the checks. The judge of the civil court of Fulton County, in passing upon the questions of law and fact, erred in finding for the defendant. I therefore dissent from the judgment of affirmance.